UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GRAFTON & UPTON RAILROAD COMPANY, JON DELLI PRISCOLI AND MICHAEL R. MILANOSKI, AS TRUSTEES OF ONE HUNDRED FORTY REALTY TRUST, | * * * * * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| TOWN OF HOPEDALE, THE HOPEDALE SELECT BOARD, BY AND THROUGH ITS MEMBERS, GLENDA HAZARD, BERNARD STOCK, AND BRIAN KEYES, AND THE HOPEDALE CONSERVATION COMMISSION, BY AND THROUGH ITS MEMBERS, BECCA SOLOMON, MARCIA MATTHEWS, AND DAVID GUGLIELMI, | * * * * * * * * * | Civil Action No. 4:22-cv-40080-ADB |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM & ORDER**

BURROUGHS, D.J.

I.      **INTRODUCTION**

At its core, this is a dispute between Grafton & Upton Railroad Company ("GURR" or

"Plaintiffs"), a Class III rail carrier, and the Town of Hopedale,[1] regarding a portion of property

at 364 West Street in Hopedale, Massachusetts.  GURR has planned and is working on building a

transloading and logistics facility on the property to support its rail operations.  Hopedale

meanwhile seeks to take by eminent domain a substantial portion of the property and is also

---

[1] Defendants in this case include the Town of Hopedale (the "Town" or "Hopedale"); the
Hopedale Select Board (the "Select Board"); the Select Board's members, Glenda Hazard,
Bernard Stock, and Brian Keyes; the Hopedale Conservation Commission (the "Conservation
Commission"); and the Conservation Commission's members, Becca Solomon, Marcia
Matthews, and David Guglielmi.

trying to stop GURR's development of the property through an Enforcement Order issued by its Conservation Commission.  To forestall the taking and any interference with their development plans, Plaintiffs initiated this action and argue, primarily, that both the proposed taking and the Enforcement Order are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101 *et seq*.  Presently before the Court are Defendants' motion to dismiss the complaint, [ECF No. 51], and Plaintiffs' motions for a preliminary injunction to enjoin the proposed taking and any actions to carry out the Enforcement Order, [ECF Nos. 26 and 28].  For the reasons set forth below, the motion to dismiss is <u>GRANTED</u> in part and <u>DENIED</u> in part, and the motions for preliminary injunction are <u>ALLOWED</u>.

II.    **FACTUAL BACKGROUND**

A.    **The Railroad and the Property**

GURR is a short-line rail carrier that owns and operates 16.5 miles of rail line that runs in part through Hopedale, Massachusetts.  [ECF No. 1 ("Compl.") ¶ 17].  A portion of that rail line "bifurcates and runs through property located at 364 West Street in Hopedale[,]" [<u>id.</u>], which has been "zoned for industrial uses," [<u>id.</u> ¶ 26].  One Hundred Forty Realty Trust (the "Trust") is the record owner of title to the property at 364 West Street, [Compl. at 1 n.1], and on October 12, 2020, GURR purchased the beneficial interest of the Trust and is the Trust's sole beneficiary, [<u>id.</u> ¶¶ 3, 27].[2]  As a result of this purchase, GURR "became the owner of the 155-acre parcel at 364 West Street including the approximately 130 acres of what was, at that time, forestland."  [<u>Id.</u> ¶ 27].  GURR also later acquired additional land parcels such that its total acreage in the area of 364 West Street is currently 198.607 acres.  [<u>Id.</u> ¶¶ 28–29].

_____

[2] Plaintiffs Jon Delli Priscoli and Michael R. Milanoski are the trustees of the Trust.  [<u>Id.</u> ¶ 4].

The "Transloading and Logistics" center that GURR intends to build on the property will include new track, more than 1,500,000 square feet of space for transloading and temporary storage, and necessary infrastructure to support the facility including stormwater detention and basins, as well as sewage treatment.  [Id. ¶ 31].  As of the filing of this lawsuit, the transloading and logistics center was "under construction."[3]  [Id. ¶ 33].  GURR further states that it acquired the property, and worked to develop it, "to support rail transportation that will include on the entirety of the site transloading, temporary storage, services related to transloading or temporary storage, and whatever additional rail activities are necessary or required in order to support the rail business that currently exists and is anticipated in the future . . . ."  [Id. ¶ 34].

### B.    Proposed Taking & Enforcement Order

At a meeting on June 21, 2022, the Hopedale Select Board voted to pursue the taking of approximately 130 acres of real property at 364 West Street by eminent domain, pursuant to Chapter 79 of the Massachusetts General Laws.  See [Compl. ¶¶ 62, 74].  At that same meeting, the Select Board scheduled a Special Town Meeting for July 11, 2022 to vote on a motion to authorize the Select Board to carry out the proposed taking.  [Id. ¶ 63].  On that day, the Special Town Meeting voted to authorize the Select Board to take the 130 acres, plus or minus, of real property located at 364 West Street by eminent domain.  [Id. ¶ 70].  On July 14, 2022, the Select Board noticed a meeting for July 19, 2022, at which they would vote on the taking authorized by the Special Town Meeting.  [Id. ¶¶ 71–72].

---

[3] GURR's development of 364 West Street is subject to federal environmental statutes and regulations and is further subject to oversight by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers.  [Compl. ¶¶ 124, 129].  The EPA has inspected the sight on at least one occasion, on May 31, 2022, regarding a general permit for stormwater discharges from construction activities.  [Compl. ¶ 124; ECF No. 6-1 at 58–62].

At the earlier July 11, 2022 Select Board meeting, the "Special Town Counsel" stated that the Select Board could record a notice of taking immediately after voting to take the land. [Id. ¶ 75].  Plaintiffs thus allege, on information and belief, that the Select Board intended to record a notice of taking of real property immediately after the scheduled vote on July 19, 2022. [Id. ¶ 76].  Plaintiffs additionally note that under Chapter 79, "the recording of the notice of taking immediately vests title to the property in the municipality."  [Id. ¶ 77]; see also Mass. Gen. Laws ch. 79, § 3 ("Upon the recording of an order of taking under this section, title to the fee of the property taken or to such other interest therein as has been designated in such order shall vest in the body politic or corporate on behalf of which the taking was made . . . .").

Around the same time that the Select Board was moving towards recording a notice of taking of a portion of the property at 364 West Street, the Conservation Commission also acted to interrupt GURR's development of the property.  On July 14, 2022, the Conservation Commission emailed an Enforcement Order to GURR's president that stated that GURR and the record owner of title of 364 West Street, the Trust, were in violation of the Massachusetts Wetlands Protection Act as a result of the work being done at the property to develop the transloading facility.  [Compl. ¶ 126].  The Enforcement Order directed GURR to cease and desist from further development of the facility.  [Id. ¶ 127].

## III.     PROCEDURAL HISTORY

Plaintiffs filed suit on July 18, 2022, see [Compl.], and simultaneously filed emergency motions for preliminary injunctions and temporary restraining orders to (1) stop the Select Board from recording a notice of taking by eminent domain of any portion of GURR's property at 364 West Street in Hopedale, Massachusetts, and (2) enjoin the Conservation Commission from enforcing its July 14, 2022 Enforcement Order, [ECF Nos. 2 and 4].  Defendants filed a combined opposition to the emergency motions on July 19, 2022, [ECF No. 14], and later that

day the parties appeared before Chief Judge Saylor for a hearing on the motions, see [ECF No. 17]. Following the hearing, Chief Judge Saylor entered a temporary restraining order prohibiting Defendants from recording any notice of taking of property at 364 West Street. [ECF No. 18]. Two days later, the parties appeared telephonically for a status conference before this Court. [ECF No. 20]. At that hearing, the parties each expressed an intent to re-brief the pending motions for preliminary injunction and the oppositions. On July 26, 2022, the Court entered an amended temporary restraining order that extended the order entered by Chief Judge Saylor until this Court issued a ruling on the forthcoming motions for preliminary injunction. [ECF No. 23].

Plaintiffs filed the currently pending motions for preliminary injunction, [ECF Nos. 26 and 28], on July 28, 2022. Defendant filed its combined opposition on August 4, 2022, [ECF No. 32], Plaintiffs replied on August 8, 2022, [ECF No. 40], and Defendants filed a sur-reply on August 9, 2022, [ECF No. 45]. Supplemental briefing eventually followed. [ECF Nos. 62–66].

On August 12, 2022, Defendants moved to dismiss Plaintiffs' complaint for failing to establish subject matter jurisdiction or to state a claim. [ECF No. 51]. Plaintiffs opposed the motion on August 25, 2022, [ECF No. 53], Defendants replied, [ECF No. 56], and Plaintiffs filed a sur-reply, [ECF No. 57].

Plaintiffs have also filed a motion for clarification of the orders issued by this Court, [ECF No. 59], which Defendants oppose, [ECF No. 60].

## IV.    MOTION TO DISMISS

### A.    Motion to Dismiss for Lack of Jurisdiction

#### i.    Legal Standard

"A district court generally has the obligation, when there is any question, to confirm that it has subject matter jurisdiction prior to considering the merits of the underlying controversy." Sinapi v. R.I. Bd. of Bar Exam'rs, 910 F.3d 544, 549 (1st Cir. 2018). When evaluating a motion

to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) at the pleading stage, granting

such a motion "is appropriate only when the facts alleged in the complaint, taken as true, do not

justify the exercise of subject matter jurisdiction." Muniz-Rivera v. United States, 326 F.3d 8,

11 (1st Cir. 2013).  "When a district court considers a 12(b)(1) motion, it must credit the

plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's

favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010).  "In deciding the question,

[courts] may consider whatever evidence has been submitted in the case." Acosta-Ramirez v.

Banco Popular de P.R., 712 F.3d 14, 18 (1st Cir. 2013) (citing Aversa v. United States, 99 F.3d

1200, 1210 (1st Cir. 1996)).  "While the court generally may not consider materials outside the

pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion,"

and attaching exhibits to a Rule 12(b)(1) motion does not convert it to a motion for summary

judgment. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002).

> ii.     The Court Has Jurisdiction over Plaintiffs' ICCTA Preemption Claims

Congress passed the ICCTA in 1995, in part, to "substantially deregulate[] the rail and

motor carrier industries." Pejepscot Indus. Park, Inc. v. Me. Cent. Ry. Co., 215 F.3d 195, 197

(1st Cir. 2000) (citing H.R. Rep. No. 104-311, at 95 (1995) ("[C]hanges are made to reflect the

direct and complete preemption of State economic regulation of railroads.  The changes include

extending exclusive Federal jurisdiction to matters relating to spur, industrial, team, switching or

side tracks formerly reserved for State jurisdiction under former section 10907.")).  Consistent

with this policy, the ICCTA established the Surface Transportation Board ("STB") within the

Department of Transportation, see Pub. L. 104-88, § 201(a), 109 Stat. 803, 932 (1995) (codified

as amended at 49 U.S.C. § 1301), and granted it exclusive regulatory authority over rail

transportation.  In pertinent part, § 10501(b) of the ICCTA states that the STB's jurisdiction over

> (1) transportation by rail carriers . . . ; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one state,

is exclusive.

49 U.S.C. § 10501(b).  The ICCTA's definition of "transportation" sweeps broadly and includes a "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail . . . [and] services related to that movement, including receipt, delivery, . . . transfer in transit, . . . handling, and interchange of passengers and property . . . ."  Id. § 10102(9).  The First Circuit has found that transloading facilities fall under the definition of transportation under the ICCTA and that "[i]t is well-established that the preemption of state and local regulation under the ICCTA generally extends to transloading facilities."  Grosso v. Surface Transp. Bd., 804 F.3d 110, 118 (1st Cir. 2015).

Section 10501(b) of the ICCTA further states that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."  49 U.S.C. § 10501(b).  Courts have thus held that the "ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation."  Island Park, LLC v. CSX Transp., 559 F.3d 96, 102 (2d Cir. 2009) (internal quotation marks omitted) (quoting N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 252 (3d Cir. 2007)).  Further, courts have found that the ICCTA preempts takings, or attempted takings, that would unduly interfere with rail transportation, but permits those where, for example, a town seeks to acquire routine, non-conflicting uses.  See City of Lincoln v. Surface Transp. Bd., 414 F.3d 858, 858, 861–62 (8th Cir. 2005) (affirming STB's finding that a city's proposed taking by eminent

domain of a 20-foot strip of a rail line's right of way was preempted by § 10501(b) because it

interfered with rail transportation); Union Pac. R.R. Co. v. Chi. Transit Auth., 647 F.3d 675,

680–82 (7th Cir. 2011) (attempted condemnation of right of way was federally preempted

because it interfered with railroad's use of the property by, among other things, preventing use of

property for additional tracks).  Courts have also held it appropriate to consider a railway's

"future plans as well as its current uses" of property to determine whether a proposed taking, or

other state regulation, is preempted.  City of Lincoln, 414 F.3d at 862.

Defendants argue that because the ICCTA vests exclusive jurisdiction in the STB, and

because § 10501(b) is a preemption statute and not a cause of action, the Court lacks jurisdiction.

Plaintiffs respond that their claims under § 10501(b) present a federal question and invoke the

Court's equity jurisdiction.

The Court begins by noting that the outcome Defendants propose would appear to be

antithetical to Congress's expressed intent in passing the ICCTA.  As noted above, by passing

the ICCTA, Congress intended to accomplish the "complete pre-emption of State economic

regulation of railroads" and to "extend[] exclusive Federal jurisdiction" over elements of rail

transportation that had been "formerly reserved for State jurisdiction."  H.R. Rep. No. 104-311,

at 95 (1995).  Yet if the Court finds, as Defendants urge, that it lacks jurisdiction over this action,

the Town will record the notice of taking and title to the property—on which GURR is

constructing a transloading facility—will be immediately transferred to the Town.  While the

Court sets forth its reasoning more fully below, it seems clear that such a taking reflects the sort

of interference that Congress sought to prohibit in passing the ICCTA.  With that framing, the

Court considers whether it has jurisdiction over Plaintiffs' preemption claims.

In Shaw v. Delta Airlines, Inc., the Supreme Court stated that "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights[,]" 463 U.S. 85, 96 n.14 (1983) (citing Ex parte Young, 209 U.S. 123, 160–62 (1908)), and that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve[,] id. (citing Smith v. Kan. City Title & Tr. Co., 255 U.S. 180, 199–200 (1921)).  Although this case would seem to fall within this description, Defendants contend that jurisdiction is nonetheless foreclosed because the ICCTA explicitly vests "exclusive" jurisdiction in the STB.  Defendants further argue that courts sitting in equity are "subject to express and implied statutory limitations" and that by creating the STB and granting it exclusive jurisdiction over  "transportation by rail carriers" as well as "the construction . . . of spur, industrial, team, switching, . . . or facilities[,]" 49 U.S.C. § 10501(b), Congress divested federal courts of jurisdiction to hear claims alleging that state regulation of rail transportation is preempted by the ICCTA.  See, e.g., [ECF No. 52 at 6 (citing Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320 (2015))].

Defendants analogize this case to Seminole Tribe of Florida v. Florida wherein a tribe brought suit under the Indian Gaming Regulatory Act ("IGRA") to compel the Governor of Florida to negotiate with the tribe toward a compact regarding gaming activities, as required by Section 2710(d)(3) of the IGRA.  517 U.S. 44, 47 (1996).  The tribe argued, in part, that federal jurisdiction was proper under the doctrine of Ex parte Young.  Id. at 73.  The Supreme Court disagreed.  Id.  Although the Court acknowledged that it had "often found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order

8

to 'end a continuing violation of federal law[,]'" id. (quoting Green v. Mansour, 474 U.S. 64, 68 (1985), it nonetheless found the situation presented in Seminole Tribe to be "sufficiently different from . . . the traditional Ex parte Young action so as to preclude the availability of that doctrine," id.  There, even though the Governor's failure to negotiate with the tribe was inconsistent with § 2710(d)(3), the provision requiring such negotiation had to be considered in conjunction with the remedial provision, § 2710(d)(7) which was both intricate and "intended . . . not only to define, but also to limit significantly, the duty imposed by § 2710(d)(3)."  Id. at 74. The Court concluded that, based on the intricacy of the statute and the limited nature of the remedy,[4] Congress, through the IGRA, "displayed an intent not to provide the 'more complete and immediate relief' that would otherwise be available under Ex parte Young."  Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 647 (2002) (citing Seminole Tribe, 517 U.S. at 75) (discussing Seminole Tribe); see also Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 256 n.3 (2011) (explaining that the Court had not permitted cases alleging violation of the IGRA to proceed in equity because doing so would undermine the limited nature of the remedial provision).

The Supreme Court reached a similar conclusion in Armstrong, wherein healthcare providers in Idaho sued state officials under the Medicaid Act seeking a court order requiring the officials to raise reimbursement rates in compliance with the statute.  575 U.S. 323–24.  The plaintiffs argued that their suit could proceed in equity, but the Court again disagreed.  Id. at 328. It found that Congress had intended to foreclose equitable relief because (1) the only remedy the

---

[4] "The 'intricate procedures set forth in [§ 2710(d)(7)]' prescribed that a court could issue an order directing the State to negotiate, that it could require the State to submit to mediation, and that it could order the Secretary of the Interior be notified."  Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 647 (2002) (citing Seminole Tribe, 517 U.S. at 74–75).

statute provided for a State's breach was the withholding of Medicaid funds, and (2) the statute was "judicially unadministrable[.]"  Id.  The Supreme Court noted that the fact that Congress had provided a sole remedy "might not, *by itself*, preclude the availability of equitable relief" but the fact of a sole remedy "when combined with the judicially unadministrable nature" of the statute was sufficient to find equity jurisdiction foreclosed.  Id. (citing Stewart, 563 U.S. at 256 n.3).

Turning to the instant matter, the Court finds that the Supreme Court's decisions in Seminole Tribe and Armstrong do not compel the conclusion that the Court lacks jurisdiction here.  Perhaps the most distinguishing characteristic is the limited nature of the remedial schemes imposed by the IGRA and Medicaid Act that were at issue in Seminole Tribe and Armstrong, respectively, compared to the broad language of § 10501(b).  In Seminole Tribe, the remedy for a violation of § 2710(d)(3) of the IGRA was limited to an order directing state officials to negotiate, submit to mediation, or that the Secretary of the Interior could be notified.  Seminole Tribe, 517 U.S. at 74–75.  And in Armstrong, the remedy for setting reimbursement rates in a manner inconsistent with § 30A of the Medicaid Act was the withholding of Medicaid funds by the Secretary of Health and Human Services.  Armstrong, 575 U.S. at 328–29.  In the Supreme Court's view, such "modest . . . sanctions" displayed Congressional intent "not to provide the 'more complete and more immediate relief' that would otherwise be available under Ex parte Young."  Verizon Md., 535 U.S. at 647.  In contrast, the "strong language" of the ICCTA's preemption provision, § 10501(b), is not similarly constrained, reflecting Congress's intent to proscribe any undue interference with rail transportation by state regulation.  See New Eng. Cent. R.R., Inc. v. Springfield Terminal Ry. Co., 415 F. Supp. 2d 20, 23 (D. Mass. 2006); see also Engelhard Corp. v. Springfield Terminal Ry. Co., 193 F. Supp.2d 385, 389 (D. Mass. 2002) ("The concluding sentence of section 10501(b) is an unmistakable statement of Congress's intent

to preempt state laws touching on the substantive aspects of rail transportation.").  And unlike the IGRA and Medicaid Act, the language of the ICCTA does not indicate Congressional intent to foreclose relief available under Ex parte Young.  While permitting the claims in Seminole Tribe and Armstrong to proceed in equity would have allowed for remedies greater than those imagined by the statutes themselves, thereby undermining congressional intent, exercising jurisdiction under Ex parte Young here, for the limited purpose of evaluating preemption, does not similarly run afoul of the statute or congressional intent because determining whether a state regulation should be enjoined as preempted is entirely consistent with the purpose of the ICCTA.[5]

The present situation is further distinguishable from Armstrong because § 10501(b) of the ICCTA, unlike § 30(A) of the Medicaid Act, is not judicially unadministrable.  As the parties agree, § 10501(b) is, at least in part, a preemption statute, and federal courts are routinely called upon to make findings regarding the preemptive effect of federal laws.  In contrast, the Supreme Court observed that it was "difficult to imagine a requirement broader and less specific" than § 30(A) of the Medicaid Act, which it referred to as a "judgment-laden standard," Armstrong, 575 U.S. at 328, that benefitted from "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking," id. at 328–29 (citing Gonzaga Univ. v. Doe, 536 U.S. 273, 292 (2002) (Breyer, J., concurring in judgment)).

---

[5] In their briefing, the parties appear to assume, without discussing, that Defendants qualify as state actors.  Because the parties do not dispute this point, and because courts have found that municipalities and local officials are sometimes considered to be acting as an arm of the state or as state actors for purposes of a specific case, see, e.g., McGee v. Cole, 115 F. Supp. 3d 765, 773 (S.D.W. Va. 2015) (collecting cases), the Court accepts, for the purposes of this order, that Defendants, acting under color of state law, qualify as state actors.

Therefore, unlike in <u>Armstrong</u>, the exercise of federal jurisdiction here does not undermine the purpose of the statute nor is the provision at issue judicially unadministrable.

For the foregoing reasons, the Court concludes that it may properly exercise its equity jurisdiction over Plaintiffs' preemption claims.[6]  Defendants' motion to dismiss for lack of jurisdiction is therefore <u>DENIED</u>.

> iii.   <u>Plaintiffs' § 1983 Claim Fails to the Extent It Is Brought Under the ICCTA</u>

Plaintiffs also bring a claim under 42 U.S.C. § 1983 alleging interference with the federal right to participate in interstate commerce, and purport to bring this claim, in part, pursuant to the ICCTA.  Defendants argue that Plaintiffs' § 1983 claim fails under Rule 12(b)(1) to the extent it is brought pursuant to the ICCTA because § 1983 does not create a substantive cause of action

---

[6] Because the Court finds that it may properly exercise equity jurisdiction over Plaintiffs' preemption claims, the Court does not reach the issue of whether the preemption claims raise a federal question or, alternatively, if the language of § 10501(b) precludes federal question jurisdiction.

Nonetheless, the Court notes that numerous other federal courts and the STB have found that federal courts do have jurisdiction to determine issues of preemption.  <u>See, e.g.</u>, <u>Or. Coast Scenic R.R., LLC v. Or. Dep't of State Lands</u>, 841 F.3d 1069, 1072 (9th Cir. 2016) (the plaintiff railroad "present[ed] a federal question by alleging that enforcement of the state removal-fill law is preempted by the federal ICCTA; thus the district court had subject matter jurisdiction under 28 U.S.C. § 1331"); <u>Elam v. Kan. City S. Ry. Co.</u>, 635 F.3d 796, 810 (5th Cir. 2011) (finding that the ICCTA's "legislative history suggests Congress did not intend § 10501(b) to preclude original (or removal) federal jurisdiction over claims arising under the ICCTA" and "recognizing the STB's primary jurisdiction does not divest the district court of its original subject matter jurisdiction"); <u>Coastal Distrib., LLC v. Town of Babylon</u>, 216 Fed. App'x 97, 103 (2d Cir. 2007) ("The very basis for federal jurisdiction here was the appellees' assertion that the Town and its [Zoning Board of Appeals] were preempted by federal law from taking any action to regulate [a transloading facility operated by Plaintiff] . . . ."); <u>Jie Ao & Xin Zhou — Pet. for Declaratory Order</u>, No. FD 35539, 2012 WL 2047726, at *3 (S.T.B. June 4, 2012) (STB decision stating that "issues involving the federal preemption provision contained in 49 U.S.C. § 10501(b) can be decided either by the Board or the courts in the first instance"); <u>Brookhaven Rail Terminal and Brookhaven Rail, LLC — Pet. for Declaratory Order</u>, No. FD 35819, 2014 WL 4253048, at *3 (S.T.B. Aug. 26, 2014) (finding similarly that "the Board and courts have concurrent jurisdiction to determine preemption").

by itself and also does not create an individually enforceable right.  [ECF No. 52 at 11].  Because

the Court agrees that § 10501 does not create an individually enforceable right, Plaintiffs' § 1983

claim fails to the extent it is brought under the ICCTA.

>    Section 1983 states, in pertinent part:
>
>    Every person who, under color of any statute, ordinance, regulation, custom, or
>    usage, of any State or Territory or the District of Columbia, subjects, or causes to
>    be subjected, any citizen of the United States or other person within the
>    jurisdiction thereof to the deprivation of any rights, privileges, or immunities
>    secured by the Constitution and laws, shall be liable to the party injured in an
>    action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Not all federal statutes create rights which are remediable by § 1983, and

courts must look to "rights-creating language" and an "individual[] focus" in the statute's text

and structure to determine whether Congress unambiguously intended to create individual rights.

Gonzaga, 536 U.S. at 290.

>    In Gonzaga, the Supreme Court found that the Family Educational Rights and Privacy

Act of 1974 ("FERPA"), which provides for the withdrawal of federal funding from educational

institutions that impermissibly release student records, does not confer rights to individual

students—and thus conferred no rights enforceable under § 1983—because the statute's

nondisclosure provisions "contain no rights-creating language" and "they have an aggregate, not

individual focus . . . ."  536 U.S. at 290.  The same is true of § 10501 of the ICCTA, which

merely forbids State and local legislation in the area of rail transportation.  Put differently, the

statute creates a regulatory scheme which requires State and local authorities to refrain from

regulating rail transportation.  The statute's "focus on the person regulated rather than the

individuals protected creates 'no implication of an intent to confer rights on a particular class of

persons.'"  Id. at 287 (quoting Alexander v. Sandoval, 532 U.S. 275, 289 (2001)).  The "person's

regulated," in § 10501(b) are the State and political subdivisions, insofar as they are forbidden

from promulgating laws related to "transportation by rail carriers, and . . . the construction . . . of spur, industrial, team, switching, or side tracks, or facilities . . . ."  49 U.S.C. § 10501(b).  Thus, like FERPA, the statute, § 10501(b), regulates the activities of the targeted governmental entities, and does not manifest an intent to grant a specific entitlement to any individuals or entities.

Accordingly, Defendants' motion to dismiss Plaintiffs' § 1983 claim is <u>GRANTED</u> to the extent the claim was brought under the ICCTA.

**B.    Motion to Dismiss for Failure to State a Claim**

i.    <u>Legal Standard</u>

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all well-pled facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in the plaintiff's favor.  <u>See</u> <u>Gilbert v. City of Chicopee</u>, 915 F.3d 74, 80 (1st Cir. 2019).

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  <u>Grajales v. P.R. Ports Auth.</u>, 682 F.3d 40, 44–45 (1st Cir. 2012) (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  "The plausibility standard invites a two-step pavane."  <u>A.G. ex rel. Maddox v. Elsevier, Inc.</u>, 732 F.3d 77, 80 (1st Cir. 2013) (citing <u>Grajales</u>, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  <u>Id.</u> (quoting <u>Morales-Cruz v. Univ. of P.R.</u>, 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  <u>Id.</u> (quoting <u>Morales-Cruz</u>, 676 F.3d at 224).

ii. <u>Plaintiffs' § 1983 Claim Asserting Violation of the Dormant Commerce Clause Fails</u>

Defendants argue that Plaintiffs' § 1983 claim also fails to the extent it is brought under the dormant Commerce Clause because the complaint is "devoid of any specific factual allegations about how the taking would affect the interstate rail transportation network." [ECF No. 52 at 12]. The Court largely agrees.

The Supreme Court "has long construed the Commerce Clause to be not only an affirmative grant of authority to Congress to regulate interstate commerce but also a negative, 'self-executing limitation on the power of the states to enact laws that place substantial burdens on interstate commerce.'" <u>Ne. Patients Grp. V. United Cannabis Patients & Caregivers of Me.</u>, 45 F.4th 542, 545 (1st Cir. 2022) (internal brackets omitted) (quoting <u>S.-Cent. Timber Dev., Inc. v. Wunnicke</u>, 467 U.S. 82, 87 (1984)). The Supreme Court has further stated that the dormant Commerce Clause "prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby 'impedes free private trade in the national marketplace.'" <u>Gen. Motors Corp. v. Tracy</u>, 519 U.S. 278, 287 (1997) (citations and internal brackets omitted) (quoting <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429, 437 (1980)). Put differently, "[i]f a state or local government . . . enacts a law that unduly favors in-state commercial interests over their out-of-state counterparts, that law 'routinely' will be defenestrated under the dormant Commerce Clause 'unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.'" <u>Houlton Citizens' Coal. v. Town of Houlton</u>, 175 F.3d 178, 184 (1st Cir. 1999) (quoting <u>West Lynn Creamery, Inc. v. Healy</u>, 512 U.S. 186, 192–93 (1994)).

> To determine whether a statute violates the dormant Commerce Clause, we apply one of several levels of analysis, depending on the effect and reach of the legislation.

> First, a state statute is a per se violation of the Commerce Clause when it has an "extraterritorial reach." "[A] statute that directly controls commerce occurring

wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." When a state statute regulates commerce wholly outside the state's borders or when the statute has a practical effect of controlling conduct outside of the state, the statute will be invalid under the dormant Commerce Clause.

…

Second, if a state statute discriminates against interstate commerce, we apply strict scrutiny. It will be scrutinized under a "virtually per se invalid rule," which means that the statute will be invalid unless the state can "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." This level of scrutiny will be applied if the state statute discriminates against interstate commerce on its face or in practical effect. When a state statute "discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry."

Third, a lower standard of scrutiny is applied when the state statute regulates evenhandedly and has only incidental effects on interstate commerce. In this situation, a balancing test is applied. "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

Pharm. Rsch. & Mfrs. Of Am. v. Concannon, 249 F.3d 66, 79–80 (1st Cir. 2001) (citations omitted).

Plaintiffs contend that the Town's intended taking would "unreasonably interfere with GURR's participation in interstate commerce by rail transportation." [Compl. ¶ 102]. Plaintiffs, however, do not allege that the taking has an extraterritorial reach, so the Court moves to the second step and considers whether the taking discriminates against interstate commerce. "Discrimination" in this context "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Or. Waste Sys., Inc. v. Dep't of Env't. Quality of State of Or., 511 U.S. 93, 99 (1994). Here, Plaintiffs allege that GURR, an in-state carrier, is burdened to the extent it cannot ameliorate supply chain issues. But the

inability to ease such issues is not the same as alleging that a state regulation benefits an in-state carrier to the detriment of out-of-state carriers.  Thus, the Court finds that Plaintiffs have not alleged that the taking is discriminatory in the context of the dormant Commerce Clause.

The Court therefore proceeds to the third step and applies the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970).  When a state statute regulates evenhandedly and has only incidental effects on interstate commerce, that statute will be upheld unless the burden on interstate commerce is "clearly excessive in relation to the putative local benefits."  Id. at 142.

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.  If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, but more frequently it has spoken in terms of "direct" and "indirect" effects and burdens.

Id. (citations omitted).

The First Circuit has directed that when applying the Pike balancing test, courts should consider: "(1) the nature of the putative local benefits advanced by the statute; (2) the burden the statute places on interstate commerce; and (3) whether the burden is 'clearly excessive' as compared to the putative local benefits."  Concannon, 249 F.3d at 83–84 (quoting Pike, 397 U.S. at 142).  "[T]he fact that a law may have 'devastating economic consequences' on a particular interstate firm is not sufficient to rise to a Commerce Clause burden."  Id. at 84 (quoting Instructional Sys. v. Comput. Curriculum Corp., 35 F.3d 813, 827 (3d Cir. 1994) (further citation omitted)); see also Exxon Corp. v. Governor of Md., 437 U.S. 117, 127–28 (stating that "the

[Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations").

Here, the Court finds that Plaintiffs' § 1983 dormant Commerce Clause claim fails because they have not adequately alleged an adverse effect on interstate commerce. While the taking would likely have a significant impact on GURR, that alone is not sufficient to make out a claim under the Commerce Clause. Concannon, 249 F.3d at 84. Further, although Plaintiffs allege that the taking would hinder a facility that would eventually "have a positive impact on national supply chain issues" that is different in kind from a state or local law or regulation that adversely effects existing interstate commerce. [Compl. ¶ 33]. Because the Court concludes that Plaintiffs have not sufficiently alleged a burden that gives rise to a Commerce Clause claim, Defendants' motion to dismiss the claim is GRANTED.[7]

      iii.     State Law Claims

Plaintiffs also bring counts for violations of Mass. Gen. Laws ch. 160, § 7, Mass. Gen. Laws. Ch. 40, §§ 8C, 14, Mass. Gen. Laws ch. 45, §§ 3, 19, and Massachusetts' prior public use doctrine. Defendants argue that each count fails to state a claim.

Defendants first argue that each of Plaintiffs' state law claims fails because any challenge to the validity of the proposed taking must be part of a Chapter 79 proceeding because Chapter 79 provides the "exclusive statutory remedy for takings made thereunder." [ECF No. 52 at 16 (citing Whitehouse v. Town of Sherborn, 419 N.E.2d 293, 297 (Mass. App. Ct. 1981))]. Although Plaintiffs opposed the motion to dismiss their state law claims, they did not offer arguments in response to Defendants' contention that Chapter 79 provides the exclusive remedy for takings made thereunder. As the First Circuit has repeatedly stated, "district court[s] [are]

---

[7] To the extent Plaintiffs brought a § 1983 claim pursuant to the Supremacy Clause, this claim also fails because neither § 1983 nor the Supremacy Clause confer a cause of action.

free to disregard arguments that are not adequately developed . . . ." <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 260 (1st Cir. 1999); <u>see also</u> <u>Nikijuluw v. Gonzales</u>, 427 F.3d 115, 120 n.3 (1st Cir. 2005) ("It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'"); <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990), <u>cert. denied</u>, 494 U.S. 1082 (1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . . 'Judges are not expected to be mindreaders . . . .'" (citation omitted)). Because Plaintiffs did not adequately respond to Defendants' arguments, the motion to dismiss the state law claims (Counts III, IV, and V) is <u>GRANTED</u>.

## V.        MOTIONS FOR PRELIMINARY INJUNCTION

The Court now turns to Plaintiffs motions for preliminary injunction seeking to (1) enjoin the town from recording notice of the disputed property, [ECF No. 26], and (2) enjoin enforcement of the July 14, 2022 Enforcement Order issued against GURR by Defendant Hopedale Conservation Commission, [ECF No. 28].

### A.        Legal Standard

In considering whether to grant a request for a preliminary injunction, "a district court is tasked with considering the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." <u>Ryan v. U.S. Immigr. & Customs Enf't</u>, 974 F.3d 9, 18 (1st Cir. 2020) (citations omitted). "The movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus[,]" and the First Circuit has described that factor "as the 'sine qua non' of preliminary injunctive relief." <u>Id.</u>

(quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

Thus, "if the moving party cannot demonstrate that he is likely to succeed in his quest, the

remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc., 287 F.3d

at 9. When considering the motions, the Court "may accept as true 'well-pleaded allegations in

the complaint and uncontroverted affidavits.'" Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC

Tr. Series 2016-CTT, 440 F. Supp. 3d 99, 102–03 (D. Mass. Feb. 13, 2020) (quoting Rohm &

Haas Elec. Materials, LLC v. Elec. Cirs., 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)).

### B.   Motion to Enjoin the Taking

#### i.   Likelihood of Success

Plaintiffs argue that they are likely to succeed on the merits because Hopedale's proposed

taking qualifies as a state or local action that unreasonably interferes with GURR's railroad

operations at 364 West Street and is thus preempted by the ICCTA.  [ECF No. 27 at 9].

> Under the Supremacy Clause of the United States Constitution, "the Laws of the
> United States . . . shall be the supreme Law of the Land . . . any Thing in the
> Constitution or Laws of any State to the Contrary notwithstanding." As the
> Supreme Court has held, "Where a state statute conflicts with, or frustrates, federal
> law, the former must give way."

Grafton & Upton R.R. Co. v. Town of Milford, 337 F. Supp. 2d 233, 237 (D. Mass. 2004) (first

quoting U.S. Const. art. VI, cl. 2.; and then quoting CSX Transp., Inc. v. Easterwood, 507 U.S.

658, 663 (1993)).  As touched on above, the ICCTA—and its precursor, the Interstate Commerce

Act—reflects Congress's intent to federalize the regulation of rail transportation in the United

States, and to "complete[ly] preempt[] [] State economic regulation of railroads."  H.R. Rep. No.

104-311, at 95.  To accomplish this goal, Congress established, through the ICCTA, the STB,

which has exclusive jurisdiction over "transportation by rail[,]" including "the construction,

acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or

side tracks, or facilities . . . ."  49 U.S.C. § 10501(b).  And "[f]or more than a century, the

Supreme Court has made it clear that under the U.S. Constitution's Supremacy Clause (Art. VI, cl. 2), state laws or regulations that are inconsistent with the [STB's] plenary authority or with the Congressional policy reflected in the [ICCTA] are preempted." B & S Holdings, LLC v. BNSF Ry. Co., 889 F. Supp. 2d 1252, 1256 (E.D. Wash. 2012) (citing City of Auburn v. United States, 154 F.3d 1025, 1029 (9th Cir. 1998)).

Notwithstanding the ICCTA's clear and broad preemptive sweep, Defendants argue that the proposed taking is not preempted because (1) the taking will not unreasonably interfere with GURR's operations and (2) GURR's development of the transloading facility is not far enough along to allow the conclusion that the construction will "come to fruition." [ECF No. 32 at 16]. The Court finds that Defendants' argument is contrary to the language and intent of the ICCTA. "The statutory language indicates an express intent on the part of Congress to preempt the entire field of railroad regulation, including activities related to but not directly involving railroad transportation." Town of Milford, 337 F. Supp. 2d at 238 (citing 49 U.S.C. § 10102(6)(A), (C)). In particular, the ICCTA defines "transportation" as including a "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail . . . [and] services related to that movement, including receipt, delivery, . . . transfer in transit, . . . handling, and interchange of passengers and property . . . ." 49 U.S.C. § 10102(9). As noted above, the First Circuit has held that transloading facilities fall within the ICCTA's definition of transportation, and therefore it is beyond dispute that the taking would be preempted if the facility were fully constructed. See Grosso, 804 F.3d at 118 ("It is well-established that the preemption of state and local regulation under the ICCTA generally extends to transloading facilities."). The question then is whether the taking is preempted even though the facility is still in the nascent stages of construction. The Court finds that it is.

Federal appellate courts in at least the Seventh, Eighth, and the District of Columbia Circuits, as well as the STB, have held that when determining whether a proposed taking, or other regulation, is preempted, it is appropriate to consider a rail carrier's future plans as well as its current uses.  City of Lincoln v. Surface Transp. Bd., 414 F.3d 858, 862 (8th Cir. 2005); Union Pac. R.R. Co. v. Chi. Transit Auth., 647 F.3d 675, 681 (7th Cir. 2011); City of South Bend v. Surface Transp. Bd., 566 F.3d 1166, 1169 (D.C. Cir. 2009); Tri–City R.R. — Pet. for Declaratory Order, No. FD 35915, 2016 WL 5904750, at *7–8 (S.T.B. Sept. 12, 2016); Norfolk S. Ry. Co. — Pet. for Declaratory Order, No. FD 35196, 2010 WL 691256, at *4 (S.T.B. Feb. 26, 2010).  Here, Plaintiffs' verified complaint and the second affidavit of Michael R. Milanoski make it clear that GURR intends to use the property at 364 West Street to house a transloading and logistics facility, and that the property has already undergone substantial development to advance the facility's construction.  [ECF No. 30 ¶ 22 ("GURR's contractor has now finished harvesting the trees at the site . . . . Grading and preparing land adjacent to existing [] rail line has begun. . . . [and] rail ties and plates are on the site and the process of laying these ties and plates has begun."); Compl. ¶ 31 (listing GURR's plan for 364 West Street including development of, among others, new tracks and 1,500,000 square feet for transloading); id. ¶ 33 ("GURR's anticipated transloading and logistics center is under construction . . . .")].  And although Defendants contend that the taking would not interfere with GURR's rail operations because the eminent domain authorization forbids the Board from taking land that is "currently in use by the Railroad for railroad operations purposes or transloading facilities," [ECF No. 32 at 16], that argument rings hollow given Hopedale's insistence that property in the process of being developed such purposes does not fall within the ICCTA's definition of transportation. Therefore, the Court finds that because GURR has plans for developing 364 West Street as a

logistics and transloading facility, has already begun to develop the land to support that use, and has invested substantial capital in said development, the property falls under the ICCTA's definition of transportation.  The Court therefore concludes that the Town's proposed taking is preempted and that Plaintiffs will likely succeed in proving that.

        ii.     <u>Additional Prerequisites for a Preliminary Injunction</u>

The additional factors—irreparable harm, the balance of hardships, and the effect of an injunction on the public interest—weigh in favor of allowing Plaintiffs' motion for a preliminary injunction.[8]

First, there is credible evidence that GURR will suffer irreparable harm if the request for a preliminary injunction is denied.  Although "economic loss alone does not usually rise to the level of irreparable harm[,]" <u>Suero v. Fed. Home Loan Mortg. Corp.</u>, No. 13-cv-13014, 2013 WL 6709001, *7 (D. Mass. Dec. 17, 2013) (citation omitted), "[r]eal estate has long been thought unique, and thus, injuries to real estate qualify as "the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to be found 'irreparable[,]'" <u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d 907, 915 (1st Cir. 1989) (quoting <u>Camel Hair & Cashmere Inst. v. Associated Dry Goods</u>, 799 F.2d 6, 14 (1st Cir. 1986)); <u>see also</u> <u>Ocean Spray Cranberries, Inc. v. PepsiCo, Inc.</u>, 160 F.3d 58, 61 (1st Cir. 1998) (stating that injunctive relief is often granted in the context of real property because such property is unique).  Here, pursuant to Chapter 79 of the Massachusetts General Laws, the recording of the notice of taking will immediately vest title to the property in the Town.  Therefore, if Hopedale is not enjoined from recording notice, GURR will quickly be divested of title to the property and therefore unable to

---

[8] The Court considers the final two factors—balancing of the equities and the public interest— together "as they 'merge when the government is the opposing party.'"  <u>Does 1-6 v. Mills</u>, 16 F.4th 20, 37 (1st Cir. 2021) (alteration omitted) (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)).

continue developing its facility.  The fact that GURR would be deprived of real property, which is by itself unique and not well suited to economic damages, weighs in favor of finding that GURR would be irreparably harmed.  That is especially true here where the property is of heightened value to GURR because it contains several parcels of industrially zoned land bisected by an operating railroad right of way.  The Court thus finds that Plaintiffs have met their burden of showing irreparable harm.  The Court is not persuaded by Defendants' argument that GURR has an adequate remedy at law under Mass. Gen. Laws ch. 79, § 18.  Contrary to Defendants characterization, Chapter 79, § 18 does not operate as a defense to a proposed taking but only provides a mechanism to invalidate a taking after the fact, a process that could take months, if not years, to resolve.  This sort of lengthy process and the resulting impact caused by the delay is what Congress sought to avoid when it enacted the ICCTA.

Second, the combined balance of hardships and public interest factors also weigh in Plaintiffs' favor.  As discussed, denying injunctive relief would almost certainly result in GURR losing title to the real property at 364 West Street and, as a result, being unable to take advantage of its unique characteristics, including that it is zoned for industrial use and bisects a railroad right of way.  The loss of title would necessarily foreclose GURR's ability to continue developing the property.  While the Court is sympathetic to Hopedale's interest in protecting its forest land, as of the submission of the second Milanoski affidavit, much of the forest land they seek to protect has already been harvested.  [ECF No. 30 ¶¶ 22, 25].  Without in any way demeaning that interest, the harm the Town seeks to prevent appears to have already occurred, thus diminishing the force of the argument.  Moreover, to the extent Defendants argue that GURR's development of the property risks contamination of Hopedale's groundwater, as another session of this Court found in a separate lawsuit involving GURR, "the public interest will be

protected by the enforcement of federal environmental statutes and regulations promulgated thereunder" and further, that "considering the potential for economic development for the region which may arise from the development of the [transloading facility at 364 West Street], the risk of harm is outweighed by the potential benefit." Town of Milford, 337 F. Supp. 2d at 239. Additionally, the Town appears to acknowledge in its briefing that the potential harm to the Town's water supply is speculative, as it asserts, in part, that GURR's development of the land would lead to a "greater risk of contamination." [ECF No. 32 at 19].

     **C.**    **Motion to Enjoin the Enforcement Order**

     In Defendants' combined opposition to Plaintiffs' motions for injunctive relief, [ECF No. 32], only passing reference is made to the July 14, 2022 Enforcement Order, and Defendants do not respond to Plaintiffs arguments that the Enforcement Order is a preclearance regulation that is preempted by the ICCTA. Defendants also do not meaningfully respond to Plaintiffs' arguments regarding the additional preliminary injunction factors. As discussed above, because Defendants failed "to spell out [their] arguments squarely and distinctly" those arguments are deemed waived. Rivera–Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (quoting Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988)).

     Even if Defendants had responded, the Court finds that the Enforcement Order is a preclearance regulation that unduly interferes with GURR's development of its transloading facility and is thus preempted by the ICCTA. Bos. & Me. Corp. v. Town of Ayer, 330 F.3d 12, 16 (1st Cir. 2003) (describing STB preemption analysis of preclearance requirements as "finely crafted" where STB found that "preclearance requirements (including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities

or conduct operations").  The Enforcement Order is not the kind of environmental regulation that could qualify as a "[n]on-discriminatory . . . requirement[] such as [a] building and electrical code[]" but is instead a pre-construction requirement that gives a local body "the ability to deny the carrier the right to construct facilities or conduct operations" and is therefore preempted.  Id. at 16; see also [ECF No. 6-1 at 53–57 (Enforcement Order) (faulting GURR for "activities done without permit or prior notification")].

Plaintiffs have also met their burden with respect to the remaining preliminary injunction factors.  First, Plaintiffs will suffer irreparable harm if the Conservation Commission is permitted to enforce its order.  The Enforcement Order would indefinitely bar GURR from developing its transloading facility, which would likely cause GURR to lose "incalculable revenues" and impair customer relationships.  See Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (noting that the First Circuit has held that the irreparable harm requirement may be met upon a showing that, absent injunctive relief, the party seeking relief "would lose incalculable revenues and sustain harm to its goodwill" (quoting Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996)).  Plaintiffs' burden of showing irreparable harm is further satisfied because the Enforcement Order threatens a fine of up to $25,000 or imprisonment for not more than two years, and "the risk . . . of incurring civil and criminal liability constitutes a threat of immediate and irreparable harm."  Hyde Park Partners v. Connolly, 676 F. Supp. 391, 394 (D. Mass. 1987).  The Court also finds that the combined balance of hardships and public interest factors weigh in favor of granting the injunction for the same reasons discussed with respect to the motion to enjoin the taking.  Moreover, allowing the Order to be enforced would stop GURR's development of the transloading facility for an indeterminate period of time, stripping GURR of its use of this unique property and causing reputational harm.  These harms

would be difficult to mitigate whereas the risk of environmental harm is lessened because the development is subject to federal environmental regulation and oversight. Because each of the factors weighs in favor of granting the injunction, the Court allows Plaintiffs' motion for a preliminary injunction enjoining enforcement of the Conservation Commission's order.

## VI.      CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss, [ECF No. 51], is GRANTED in part and DENIED in part and Plaintiffs' motions for preliminary injunction, [ECF Nos. 26 and 28], are ALLOWED. While the Court will retain jurisdiction over this matter, consistent with this Order, the matter will be stayed to permit the STB to consider the matter in full. To accomplish this, the Court ORDERS Plaintiff GURR to file a Petition for Declaratory Order with the STB for the purpose of the STB issuing a declaratory order regarding the Town's proposed taking and the Conservation Commission's Enforcement Order. During the pendency of the STB proceeding, Defendants are hereby enjoined from (1) recording any notice of taking of any portion of GURR's property at 364 West Street, Hopedale, Massachusetts or (2) taking any action to enforce the Conservation Commission's Enforcement Order.[9]

**SO ORDERED.**

March 31, 2023                                    /s/ Allison D. Burroughs
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE

---

[9] The Court further DENIES as moot GURR's motion for clarification. [ECF No. 59].